UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIAS ABUELAZAM,

    Plaintiff,

v.

JODI DeANGELO-KIPP[1],

    Defendant.

Case No. 15-cv-13538
Hon. Matthew F. Leitman

_____/

**<u>OPINION AND ORDER (1) DENYING PETITION FOR A WRIT OF HABEAS CORPUS (ECF #1), (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO APPEAL <i>IN FORMA PAUPERIS</i></u>**

Petitioner Elias Abuelazam is a state prisoner currently confined at the Earnest C. Brooks Correctional Facility in Muskegon Heights, Mich")igan. On October 8, 2015, Abuelazam filed a *pro se* petition for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. (*See* ECF #1.) In the Petition, Abuelazam challenges his state-court conviction of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a). For the reasons stated below, the Petition is **DENIED**.

---

[1] Through this Opinion and Order, the Court amends the caption in this action to reflect the name of the warden where Abuelazam is currently incarcerated.

1

# I

On May 22, 2012, a jury convicted Abuelazam of first-degree premeditated murder in the 68th Circuit Court in Flint, Michigan.  The Michigan Court of Appeals summarized the facts with respect to Abuelazam's conviction as follows:

> During 2010, several stabbings occurred in and around Flint, Michigan, under circumstances that indicated it was the same person committing the attacks. Each of the stabbings occurred on deserted streets during the early morning hours, most of the victims were African American males, and a green/beige SUV was frequently observed alongside the curb near the targeted victims. The driver of the SUV typically would ask the victims for assistance, and when the victims would offer their aid, the driver attacked the victim.
>
> At issue in this case is the last stabbing that occurred on August 2, 2010. A police officer driving near Atherton Road in Flint discovered the victim lying on the ground. The victim had been stabbed twice, once in the lower chest area and once in the abdomen. He was bleeding heavily, but was able to tell the police that his attacker was white. Although the victim was taken to the hospital, he eventually died from his wounds. Video surveillance from a nearby market showed a partially green SUV driving to and leaving from the crime scene.
>
> After the stabbing, a member of the community called a tip hotline and reported that the sketch of the perpetrator, resulting from a previous stabbing, resembled defendant, her father's new coworker at a local supermarket. She also reported that defendant's vehicle fit the description of the green SUV. An officer with the Custom and Border Protection (formerly U.S. Customs) also received defendant's name and information that defendant was linked to stabbings in Virginia and Michigan. The officer learned that defendant had a history of traveling to and

from Israel, and discovered that defendant was on his way to Israel. Defendant then was apprehended at the Atlanta airport while his flight to Tel Aviv was boarding.

A forensic scientist testified that she compared DNA samples from defendant and the victim to blood found on shoes and jeans found in defendant's luggage. She determined that the blood on the shoes and jeans came from the victim. She also determined that blood from the car defendant was driving matched the victim's DNA as well as defendant's. A Michigan State Police trooper testified that defendant's phone position correlated with the area where the victim was stabbed, as well as the location of other attacks.

At trial, defendant presented an insanity defense. His expert testified that defendant was a paranoid schizophrenic and at the time of the stabbings he did not understand his conduct was wrong. The expert further opined that defendant experienced bizarre delusions and believed evil forces made him harm others. However, the state's three witnesses—a supervisor manager at a forensic psychiatry center, a psychiatrist, and a psychologist—disagreed with that diagnosis. They explained that defendant's behavior in seeking out solitary victims was indicia of a plan, and was goal directed behavior. They further testified that defendant's behavior was inconsistent with paranoid schizophrenia. As the state's psychiatrist explained, defendant "appreciated that what he was doing was wrong.... He went on dark roads, picked out victims, had weapons available to him, left the scene of his behavior, actually tried to leave the country and but for luck and good police work would've been in Israel. So he knew that his behavior was wrong."

The jury found defendant guilty of first-degree premeditated murder. He was sentenced to life in prison.

*People v. Abuelazam*, 2014 WL 2600551, at ** 1-2 (Mich. Ct. App. June 10, 2014).

The Michigan Court of Appeals affirmed Abuelazam's conviction. *See id.* Abuelazam then sought leave to appeal in the Michigan Supreme Court, and that court denied leave. *See People v. Abuelazam*, 856 N.W.2d 52 (Mich. 2014).

On October 8, 2015, Abuelazam filed the Petition in this Court. (*See* ECF #1.) He seeks relief on the following grounds:

> I. The trial court deprived Mr. Abuelazam of his right to a fair trial by an impartial jury when it denied his motion for a change of venue despite the extensive and inflammatory publicity of the case that permeated the Flint community and tainted the entire jury pool.
>
> II. The trial court erred by admitting evidence of prior bad acts in a case where the only issue was whether Mr. Abuelazam was criminally responsible for Mr. Minor's death. The minimal probative value of this evidence was substantially outweighed by its prejudicial effect. The trial court further erred by refusing to grant a mistrial when witnesses referred to Mr. Abuelazam as a serial killer.

(*Id.* at Pg. ID 3.)

## II

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), imposes the following standard of review in habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Id.* at 103.

# III

## A

Abuelazam first claims that the state trial court erred when it denied his motion to change venue because of extensive pretrial publicity. (*See* ECF #1 at Pg. ID 3.) The Michigan Court of Appeals considered this claim on Abuelazam's direct appeal and rejected it:

> "Generally, criminal defendants must be tried in the county where the crime was committed." *People v. Unger*, 278 Mich.App. 210, 253, 749 N.W.2d 272 (2008). However, a court "upon good cause shown by either party may change the venue ... and direct the issue to be tried in the circuit court of another county[.]" MCL 762.7. Ultimately, "[t]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Unger*, 278 Mich.App. at 254, 749 N.W.2d 272 (quotation marks and citations omitted).
>
> In regard to pretrial publicity, "the initial question is whether the effect of pretrial publicity ... was such unrelenting prejudicial pretrial publicity that the entire community will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue." *Jendrzejewski*, 455 Mich. at 501, 566 N.W.2d 530 (quotation marks, citation, and brackets omitted). Merely because jurors were exposed to news accounts about the crime does not give rise to a presumption that defendant's due process rights were violated or that he is entitled to a change of venue. *People v. DeLisle*, 202 Mich.App. 658, 664–665, 509 N.W.2d 885 (1993). Instead, a defendant must show "there is either a pattern of strong community feeling against him and that the publicity is so extensive and inflammatory that jurors could not remain impartial

when exposed to it, or that the jury was actually prejudiced or the atmosphere surrounding the trial was such as would create a probability of prejudice." *People v. Cline*, 276 Mich.App. 634, 639, 741 N.W.2d 563 (2007) (quotation marks and citation omitted); *see also Jendrzejewski*, 455 Mich. at 500–501, 566 N.W.2d 530 ("Community prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted, and, much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice.").

Moreover, "[c]onsideration of the quality and quantum of pretrial publicity, standing alone, is not sufficient to require a change of venue. The reviewing court must also closely examine the entire voir dire to determine if an impartial jury was impaneled." *Jendrzejewski*, 455 Mich. at 517, 566 N.W.2d 530. "Whether a defendant's conviction will be reversed depends on whether, under the totality of circumstances, the defendant's trial was not fundamentally fair and held before a panel of impartial, indifferent jurors." *DeLisle*, 202 Mich.App. at 665, 509 N.W.2d 885 (quotation marks and citations omitted). As this Court has explained, "even the existence of preconceived notions regarding guilt or innocence is not enough to rebut the presumption of impartiality where the juror states that those opinions can be set aside and the case can be decided on the evidence presented at trial." *Id*.

Defendant cites four news articles in support of his claim that he was denied a fair trial in Genesee County. Defendant did not cite these articles in support of his motion for a change of venue in the trial court. He merely highlights the fact that there was pretrial publicity. As we have articulated, "the existence of pretrial publicity, standing alone, does not necessitate a change of venue." *Cline*, 276 Mich.App. at 639, 741 N.W.2d 563 (quotation marks and citation omitted). The specific articles defendants cite fail to support his argument that a change

of venue was required. Three of the articles are from national news sources, with only one originating from a local Michigan news source. Moreover, the articles are fact-based, not sensational. Although they discuss residents' fears, they do so without sensationalizing the stabbings, and do not appear aimed at inciting racial fear or hatred.

Further, defendant has failed to demonstrate that the jury impaneled in this case was biased. As stated above, "even the existence of preconceived notions regarding guilt or innocence is not enough to rebut the presumption of impartiality where the juror states that those opinions can be set aside and the case can be decided on the evidence presented at trial." *DeLisle*, 202 Mich.App. at 665, 509 N.W.2d 885. While defendant points to potential jurors who formed an opinion about the case before trial, none of them testified that they were unwilling to set aside those opinions or unable to decide the case based on the evidence presented at trial.

Thus, "defendant has failed to show that the media coverage was anything other than nonsensational, factual coverage. There is no evidence that the coverage was invidious or inflammatory, as opposed to simple factual news reporting." *Unger*, 278 Mich.App. at 255, 749 N.W.2d 272. Nor has defendant established that the news coverage revealed prejudicial information. Therefore, we find that the trial court did not abuse its discretion in denying defendant's motion for a change of venue.

*Abuelazam*, 2014 WL 2600551, at ** 2–3.

The Michigan Court of Appeals' decision was not an unreasonable application of, nor contrary to, clearly established federal law.

Two types of prejudice can arise in cases where jurors are exposed to pretrial publicity: presumed prejudice and actual prejudice. Prejudice to a defendant is

presumed where the influence of the news media, either in the community at large, or in the courtroom itself, "pervaded the proceedings." *Murphy v. Florida,* 421 U.S. 794, 802 (1975) (internal citations omitted). However, pretrial publicity, even pervasive adverse publicity, does not inevitably lead to an unfair trial. *See DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). The "indicia of impartiality" on the part of a jury is disregarded only in those cases "where the general atmosphere in the community or the courtroom is sufficiently inflammatory." *Id.* at 382 (quoting *Murphy,* 421 U.S. at 802). The "mere prior knowledge of the existence of [a] case, or familiarity with the issues involved, or even some pre-existing opinion as to the merits [of the case], does not in and of itself raise a presumption of a jury taint." *DeLisle,* 161 F.3d at 382. Indeed, a person is not presumed or automatically rendered unqualified to serve as a juror merely because he or she has been exposed to media coverage of the charged offense. Instead, the question is whether the exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented. *See Dell v. Straub,* 194 F. Supp. 2d 629, 654 (E.D. Mich. 2002). Moreover, the United States Supreme Court "has consistently emphasized the deleterious effect of pretrial publicity [primarily] when that publicity has amounted to an 'out-of-court campaign to convict,' reflecting 'inflamed public sentiment." *De Lisle* (quoting *Shepherd v. Florida*, 341 U.S. 50, 52 (1951) (Jackson J., concurring)).

A defendant can also suffer actual prejudice from jurors' exposure to pretrial publicity. To demonstrate actual prejudice, a habeas petitioner must show that one or more jurors was exposed to pretrial publicity, that these jurors entertained an opinion before trial that the petitioner was guilty, and that the jurors could not put this prejudice aside and render a verdict based solely upon the evidence. *See Dell*, 194 F. Supp. 2d at 655. *See also White v. Mitchell*, 431 F.3d 517, 533 (6th Cir. 2005) ("In order to demonstrate actual prejudice, [a habeas petitioner] must show through a review of *voir dire* testimony and the extent and nature of the publicity that a fair trial was impossible") (internal quotation marks omitted). Abuelazam has made neither showing.

First, Abuelezam has not shown that a "circuslike atmosphere" (or anything close to that) existed in the courthouse during his trial "due in large part to the intrusion of the press." *Murphy*, 421 U.S. at 799. In addition, Abuelazam has not presented evidence that the general atmosphere in the community or the courtroom during his trial was "sufficiently inflammatory" for either the Michigan courts or this Court to disregard the jury's presumed "impartiality." *Id.* at 802. Nor has Abuelazam shown that his trial took place under the conditions of "total chaos that prevailed [in cases where constitutional violations occurred]" or that such chaos "drove [the jury's] decision." *DeLisle*, 161 F.3d at 384 (citing to *Murphy,* 421 U.S. at 799). Finally, while Abuelazam has identified that some potentially inflammatory news articles

were written about him at around the time of his trial, he has not persuaded the Court that these articles amounted to an "out-of-court campaign to convict." *Id.* at 385.

Second, Abuelazam has not shown that he suffered actual prejudice from the jurors' exposure to pretrial publicity. As evidence of such prejudice, Abuelazam points to the *voir dire* process at his trial:

> [P]etitioner points to the fact that it took three days to pick a jury in his case. The trial court employed a bifurcated procedure, where the prospective jurors who had been exposed to media reports were separated from those who had not. (JT-1 7). In the first phase, the trial court questioned sixty prospective jurors individually. (JT-I 28). All sixty had been exposed to media accounts of the case. *See, e.g.*, (JT-I 3, 7, 28). Eight of these prospective jurors were dismissed for cause after expressing an inability to keep an open mind. (JT-I 68; JT-II 44, 95, 103, 116, 127; 185; 267; JT-III 65, 78). Several other prospective jurors were permitted to remain on the panel even after admitting that they had already formed opinions on the Petitioner's guilt. (JT-I 22, 29, 58; JT-II 53, 70, 87, 310). Thus, roughly a quarter of those acknowledging exposure to media reports confessed to some level of prejudice.

(Petition, ECF #1 at Pg. ID 35, citing to Jury Transcripts Vols. I, II, and III).

The record does not support Abuelazam's assertion. It indicates that during the three days of jury selection, any juror who could not render a verdict based on the evidence produced at trial was dismissed and only jurors who clearly stated that they could put aside any preconceived beliefs and keep an open mind where seated. The mere fact that a number of potential jurors were excused because they indicated that they could not be fair and impartial is insufficient to establish that the jurors who

were ultimately seated were partial or biased. *See Murphy,* 421 U.S. at 803 (fact that 20 of 78 prospective jurors were excused because they indicated an opinion as to the defendant's guilt did not conclusively suggest a community with a sentiment so poisoned against defendant as to impeach the indifference of jurors who displayed no animus of their own). Abuelazam has not identified any prospective juror who had formed an opinion about him from exposure to the pretrial publicity, who could not set aside those opinions, and who was not removed from the jury by the trial court. Nor has he presented clear and convincing evidence that the jurors empaneled could not be impartial. See *Bell v. Hurley*, 97 Fed. App'x 11, 19 (6th Cir. 2004) ("[T]he trial court's determinations regarding partiality of the individual jurors during v*oir dire* are factual findings entitled to deference unless [a habeas petitioner] can demonstrate by clear and convincing evidence that those determinations were erroneous"). For all of these reasons, Abuelazam has failed to show that the Michigan Court of Appeals unreasonably rejected his pretrial publicity claim.

**B**

Abuelazam next asserts that he was deprived of a fair trial when the state trial court allowed testimony pertaining to the other stabbings into evidence. On direct appeal, Abuelazam claimed the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The Michigan Court of Appeals considered this claim and rejected it:

Thus, even if defendant did not challenge his killing of the victim, the prosecution still had to produce evidence of the intentional killing done with premeditation and deliberation. *See People v. Bennett*, 290 Mich.App. 465, 472, 802 N.W.2d 627 (2010) ("The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation."). The other acts evidence was highly relevant to that inquiry. *See People v. Sabin*, 463 Mich. 43, 56–57, 614 N.W.2d 888, 896 (2000), quoting MRE 401 ("relevant evidence as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' "). Evidence of defendant's established pattern of seeking out and stabbing solitary victims in deserted areas during the early morning hours made it more likely that, in this case, defendant acted with a premeditated and deliberate plan when he stabbed the victim. Also, the fact that defendant asserted an insanity defense was not an admission of premeditation and deliberation. To the contrary, defendant relied on the insanity defense to rebut any contention that he acted with premeditation and deliberation. Thus, the other acts evidence was probative of whether defendant's actions involved deliberate, purposeful conduct, and to rebut his assertion that he did not understand the nature of his conduct.

Moreover, defendant has not established any unfair prejudice. While "[a]ll relevant evidence is prejudicial ... it is only unfairly prejudicial evidence that should be excluded." *People v. McGhee*, 268 Mich.App. 600, 613–614, 709 N.W.2d 595 (2005). "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id.* at 614, 709 N.W.2d 595. As noted above, the other acts evidence was highly probative of a material issue in the case: whether defendant acted with premeditation and deliberation. The trial court also exercised caution in limiting the amount of other acts evidence the prosecution could present. Defendant also fails to demonstrate that

> such evidence was introduced merely as an attempt to inject "considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *McGhee*, 268 Mich.App. at 614, 709 N.W.2d 595. Furthermore, the trial court instructed the jury that defendant was not on trial for other acts and advised the jury on the limited, permissible purpose of the other acts evidence, thereby reducing any potential for unfair prejudice. Jurors are presumed to follow their instructions. *People v. Petri*, 279 Mich.App. 407, 414, 760 N.W.2d 882 (2008).

*Abuelazam*, 2014 WL 2600551, at *4.

Abuelazam has not shown any error in the Michigan Court of Appeals' analysis that would warrant habeas relief. When reviewing "state-court determinations on state-court questions" on habeas review, a federal court is limited to deciding whether an error in state law rises to the level of a violation of the federal due process clause. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Abuelazam has failed to demonstrate such a constitutional error here with respect to the evidence introduced at his trial. The Michigan Court of Appeals did not unreasonably conclude that "the other acts evidence was [relevant and] probative of whether defendant's actions involved deliberate, purposeful conduct, and to rebut his assertion that he did not understand the nature of his conduct." *Abuelazam*, 2014 WL 2600551, at *4.

To the extent that Abuelazam contends that evidence of the other stabbings should

have been excluded under Michigan Rule of Evidence 403 because it was more prejudicial than probative, he is not entitled to habeas relief. Appraisals of the probative and prejudicial value of evidence are entrusted to the sound discretion of a state trial court judge, and a federal court considering a habeas petition should not disturb that appraisal absent a violation of the federal due process clause. *See Clark v. O'Dea,* 257 F.3d 498, 503 (6th Cir. 2001) ("Habeas review does not encompass state courts rulings on the admission of evidence unless there is a constitutional violation"). The trial court admitted evidence pertaining to the other stabbings as probative of whether Abuelazam's actions involved "deliberate, purposeful conduct, and to rebut his assertion that he did not understand the nature of his conduct." *Abuelazam*, 2014 WL 2600551, at *4. The trial court found that the evidence was admissible because it was relevant and highly probative of whether the killing was done with premeditation and deliberation. That finding, and the admission of the evidence of the other stabbings, was not unreasonable, and this Court cannot conclude that the admission of this evidence "was patently unfair, contradicted governing Supreme Court precedent, or resulted in an incorrect and unreasonable application of federal law." *Love v. Carter*, 49 Fed. App'x 6, 12 (6th Cir. 2002). For these reasons, Abuelazam is not entitled to habeas relief on this claim. *See Clark,* 257 F.3d at 503.

## C

Finally, Abuelazam asserts that the state trial court erred when it refused to grant a mistrial after witnesses referred to Abuelazam as a "serial killer," a "serial stabber," and "slasher." The Michigan Court of Appeals considered this argument on direct appeal and rejected it:

> At trial, the prosecution informed the court that it would instruct witnesses to avoid using the term "serial" in accordance with the trial court's instructions, but it acknowledged that some witnesses might inadvertently use the term. At trial, one witness recounted seeing a news report on television and stated that she "seen [sic] when the serial killer got—". Defense counsel immediately objected and the court instructed the witness to refer to "the person." A police officer also testified about the investigation and referred to a "serial stabbing." The defense counsel objected and the officer continued using the phrase "other stabbings" instead.
>
> We discern no indication that the prosecutor's questioning was calculated to elicit the objectionable terms. "As a general rule, unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony." *People v. Hackney,* 183 Mich.App. 516, 531, 455 N.W.2d 358 (1990). Further, the court was careful to advise the jury that it could not convict defendant because of other bad acts. Thus, the isolated and fleeting references to "serial" did not impair defendant's right to a fair trial. The trial court's instructions also sufficiently protected defendant's rights and cured any perceived prejudice.
>
> The trial court did not abuse its discretion in denying defendant's motion for a mistrial.

*Abuelazam*, 2014 WL 2600551, at *5.[2]

In support of this claim, Abuelazam references three specific instances that he says should have resulted in a mistrial. Abuelazam first refers to testimony from a woman who said that she recognized the "serial killer." Abuelazam's trial counsel objected to this reference, the trial court sustained the objection, and the testimony continued without incident. Abuelazam's second reference is to testimony given by a witness who identified Abuelazam from a photo array in the early morning hours following the assault. During questioning, the witness indicated that names were placed under the other pictures and that "Slasher's" name was missing. The use of the term "slasher" was brief and isolated. Abuelazam's final reference is to testimony given by Detective Thomas Bade that referred to a "serial stabbing." That remark was brief, isolated, objected to, and not repeated.

The Michigan Court of Appeals did not unreasonably apply clearly established federal law when it ruled that these references to "serial killer" and "serial stabber" discussed above were not so prejudicial as to require a mistrial. The references were isolated and the trial court instructed the jury to disregard them. (*See* ECF #9-16 at

---

[2] The Michigan Court of Appeals did not directly address Abuelazam's claim that a witness referred to him as "slasher." Abuelazam did raise that example in his brief to that court. (*See* Abuelazam State Ct. App. Br., ECF #9-19 at Pg. ID 2987.) Even if the Court were to review this specific reference *de novo*, it would still conclude, for the reasons stated below, that no constitutional error occurred with respect to the trial court's treatment of that statement.

17

Pg. ID 2599.) Nor did the one-time use of the identifier "slasher" amount to a constitutional error. Moreover, the trial court's final instructions to the jury advised them not to consider anything that had not been admitted into evidence, and Abuelazam has not presented any evidence to disregard the presumption that the jury followed these instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Under these circumstances, it was not unreasonable for the Michigan Court of Appeals to have concluded that the trial court committed no error when it denied Abuelazam's request for a mistrial. *See U.S. v. Crider*, 144 Fed. App'x 531, 534-35 (6th Cir. 2005) (defendant was not entitled to a mistrial following an unprompted statement from government witness concerning defendant's involvement in a homicide, where statement was not exceptionally prejudicial, and trial court gave curative jury instruction advising jury to disregard the statement); *Taylor v. McKee*, No. 2009 WL 1514371, \*\* 10-11 (E.D. Mich. May 29, 2009) (habeas petitioner was not entitled to relief on his claim that the trial court erred in denying habeas petitioner's motion for mistrial following a comment made by a witness that petitioner was a "killer," where the remark was not explored or repeated, and the trial court gave the jury a curative instruction). Abuelazam's mistrial claim is therefore without merit.

## IV

For all of the reasons stated above, the Court **DENIES** the Petition. The Court also **DECLINES TO ISSUE** a certificate of appealability. In order to obtain a

certificate of appealability, a habeas petitioner must make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate such a denial, the petitioner must show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *See id.* at 484.

For the reasons stated above, the Court declines to issue Abuelazam a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *See Myers v. Straub,* 159 F.Supp.2d 621, 629 (E.D. Mich. 2001).

Although this Court declines to issue Abuelazam a certificate of appealability, the standard for granting an application for leave to proceed *in forma pauperis* on appeal is lower than the standard for certificates of appealability. *See Foster v. Ludwick,* 208 F.Supp.2d 750, 764 (E.D. Mich. 2002). While a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant *in forma pauperis* status if it finds that an appeal is being taken in good faith. *See id.* at 764-65; 28 U.S.C. § 1915(a)(3);

19

Fed. R.App.24 (a). Although jurists of reason would not debate this Court's resolution of Abuelazam's claims, an appeal could be taken in good faith. Therefore, Abuelazam may proceed *in forma pauperis* on appeal.

**IT IS SO ORDERED**.

|  |  |
|---|---|
|  | s/Matthew F. Leitman |
|  | MATTHEW F. LEITMAN |
| Dated: January 16, 2018 | UNITED STATES DISTRICT JUDGE |

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 16, 2018, by electronic means and/or ordinary mail.

                s/Holly A. Monda
                Case Manager
                (810) 341-9763